# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NANCY COLE, RHONDA BACON, KIMBERLY POSTELL, and SUSAN CORMIER, individually and on behalf of all others similarly situated, | Case No.: 21-cv-02816 |
| Plaintiffs, | |
| v. | |
| RUST-OLEUM CORPORATION, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Nancy Cole, Rhonda Bacon, Kimberly Postell, and Susan Cormier (hereinafter "Plaintiffs"), by and through undersigned counsel, bring this action against Defendant Rust-Oleum Corporation ("Rust-Oleum" or "Defendant"), individually and on behalf of all others similarly situated, and alleges as follows:

## NATURE OF THE CASE

1.      This is a consumer class action lawsuit brought by Plaintiffs on behalf of purchasers of Rust-Oleum's acrylic deck coating products marketed as Rust-Oleum Restore Deck Start Wood Primer, Restore 2X One Coat Solid Stain, and Restore 4X Deck Coat (collectively, the "Restore Products").[1]

2.      Outdoor wooden decks and similar structures require periodic upkeep due to being exposed to the elements and wear-and-tear from surface contact. Such upkeep typically consists

---

[1] The list of specific Restore Products involved in this lawsuit is subject to modification as Plaintiffs develop the claims in this litigation through discovery.

of staining, painting, or use of other coatings and protective or restorative applications.

3. Rust-Oleum marketed and sold these types of products under the brand "Restore" for use by consumers seeking to repair and revitalize their existing decking, patios, and other outdoor structures. The Restore products are substantially similar formulas and products with similar labeling. The Restore Products are acrylic coatings that purport to be high-quality surfacing and re-surfacing products. Rust-Oleum aggressively marketed these products to consumers as superior, durable, and lower-maintenance products capable of resisting the elements and extending the life of, or "Restor[ing]", worn decks.

4. The Restore Products are defective and prone to failure. Plaintiffs' investigation is ongoing, and the root cause of the defect will be honed and pin-pointed through discovery; however, Plaintiffs' investigation to date has revealed, and Plaintiffs thus allege on information and belief, that there is an adhesion defect in the Restore Products that causes the products to fail to properly adhere to surfaces, even with proper surface preparation and product application.

5. Contrary to Rust-Oleum's advertising and representations, and despite proper product application, the Restore Products prematurely degrade, chip, peel, flake, strip, and otherwise deteriorate, failing to provide the advertised protection to the decks, patios, and other structures to which these products are applied.

6. The actual product performance and inevitable product failure experienced by consumers who purchased Restore Products are at odds and starkly contrast with Rust-Oleum's marketing representations, including promises and representations it makes regarding product quality and performance directly on the product labeling.

7. Examples of Rust-Oleum's product labels for the Restore Products are below:







8.     As seen above, Rust-Oleum touts that its Deck Start Wood Primer "works on weathered & worn wood"; "simplifies prep & promotes topcoat adhesion"; and that it "works with any solid topcoat." Regarding its Restore 2X product, Rust-Oleum claims that the product is a "one coat application"; is "algae and mildew resistant"; "extends the life of your deck"; and is a "superior" product. As for its Restore 4X products, Rust-Oleum touts that it "restores the beauty of moderately worn decks & patios"; provides "enhanced durability"; provides "ultimate weather resistance"; is "barefoot friendly"; and "fills hairline cracks." The Restore 2X Product label depicts water beading up on a deck coated with the product, while the Restore 4X Product label displays a "before and after" image depicting a deck with Restore 4X applied that appears to be in great condition following application, conveying that these Products work as depicted, marketed, and advertised. For each of the Products, Rust-Oleum also touts that one pail of Product is capable of providing coverage for a certain square footage. For the Deck Start Wood Primer, Rust-Oleum claims coverage of up to 450 square feet; up to 250 square feet for Restore 2X; and up to 80 square feet for Restore 4X.

9.     These representations are advertised right on the labels for the Restore Products themselves, which consumers are uniformly exposed to at the time of purchasing cans of Restore Products in-store, (e.g., at the Home Depot, Lowe's, or other hardware and home goods stores). Similar or identical product descriptions, labeling, and advertising representations are and were present on the webpages where consumers purchased the Restore Products, uniformly exposing them to Rust-Oleum's misstatements and omissions.

10.     Rust-Oleum made numerous other representations on its Restore Products labels, on its website, and elsewhere in product literature regarding the high performance and quality of its products. These representations are false, misleading, and omit the truth about the performance

of the Products. As alleged in more detail below, Plaintiffs experienced product failure despite proper application of the Restore Products and strict adherence to the Product application instructions.

11.     As consumers have discovered, the Restore Products do not live up to Rust-Oleum's promises and affirmative representations. Rather than being a "one coat application"; "algae and mildew resistant"; "extend[ing] the life of your deck"; being a "superior" product; being capable of "restor[ing]" decks; providing "enhanced durability" and "ultimate weather resistance"; "fill[ing] hairline cracks"; achieving water resistance and the "before and after" result depicted on the Product containers; and achieving the stated coverage square footage, the Restore Products deteriorate in a short time period and do not protect or restore decks. Consumers soon discover that the defective Restore Products requires tedious removal and replacement of the coatings in their entirety, since the Products fail to protect the deck itself. Thus, instead of ending the cycle of repainting and replacing, the Restore Products hasten it.

12.     Making matters worse, when consumers complain about failed Restore Products, they report that Rust-Oleum will only refund the purchase price or replace defective Restore Products with more defective Restore Products, leaving consumers with damaged decks and numerous hours of unreimbursed labor.

13.     The allegations in this lawsuit are nothing new for Rust-Oleum. Indeed, other of its similar Restore products were the subject of a publicly settled class action that asserted similar product failure. *See In Re: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation*, No. 1:15-cv-1364, MDL No. 2602 (N.D. Ill.).

14.     Rust-Oleum knew its Restore Products are defective and prone to failure, yet it marketed and sold them to many thousands of unsuspecting consumers, causing those consumers

to suffer extensive damage to their decks and other structures, and to incur monetary damage.

15.     Based on previous allegations regarding Rust-Oleum's other similar Restore products and its extensive pre-sale testing of the Restore Products, Rust-Oleum knew (or should have known) that the Restore Products suffer from a defect prior to placing the products on the market for sale to consumers, but it omitted, concealed, and otherwise failed to disclose this material information, which it intended Plaintiffs and other consumers to rely upon in deciding to purchase their Restore Products. And despite acquiring knowledge of the Defect both before, and—through consumer complaints about product failure—after taking the Restore Products to market, Rust-Oleum continued to sell these faulty products.

16.     Despite knowing that the Restore Products are flawed and prone to failure, Rust-Oleum continued to manufacture, market, and sell the Restore Products to the public while making false representations about the Restore Products' quality, durability, and other characteristics, and omitting the truth about these products.

17.     As a result of Rust-Oleum's conduct, Plaintiffs and members of the Class (defined below) have incurred substantial costs relating to their decks and other outdoor surfaces, have experienced property damage to their structures, and have otherwise been injured. Due to the flaws in the Restore Products, Class members will continue to expend considerable costs and time in attempting to repair the problems. Many consumers likely will end up having to pay for a total replacement of their decks and other structures.

18.     This class action seeks compensatory and punitive damages, declaratory relief, and other relief as a result of Rust-Oleum's violations of state consumer protection laws, breaches of warranties, negligent misrepresentations, fraudulent concealment, and violations of other laws.

## THE PARTIES

**Plaintiffs**

19.    Plaintiff Nancy Cole is an adult residing in Schodack Landing, New York.

20.    Plaintiff Rhonda Bacon is an adult residing in Topeka, Kansas.

21.    Plaintiff Kimberly Postell is an adult residing in Bellville, Ohio.

22.    Plaintiff Susan Cormier is an adult residing in Lincoln, Rhode Island.

**Defendant**

23.    Defendant Rust-Oleum Corporation is an Illinois corporation, with its corporate headquarters located in Vernon Hills, Illinois. Rust-Oleum is owned by, and is a subsidiary of, RPM International, Inc.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the amount in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00), and greater than two-thirds of the Class members reside in states other than the state in which Defendant is a citizen.

25.    This Court has personal jurisdiction over Defendant because Defendant is authorized to do business and is conducting substantial business in Illinois; Defendant is headquartered in Illinois; Defendant has specifically marketed and sold the Restore Products in Illinois; Defendant has sufficient minimum contacts with Illinois; and Defendant sufficiently avails itself of the markets of Illinois, through the promotion, sales, and marketing of Restore Products in Illinois, to render the exercise of jurisdiction by this Court permissible.

26.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

part of the events and omissions giving rise to Plaintiffs' claims occurred in this District; Defendant's misconduct alleged herein occurred in this District; Defendant is headquartered in and regularly conducts and transacts business in this District and is therefore subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.    Overview of the Restore Products and Residential Coatings

27.    Rust-Oleum purports to be a leading manufacturer and seller of protective paints and coatings for home and industrial use in the United States. Rust-Oleum is a flagship brand of RPM International, Inc., which is Rust-Oleum's parent company. Rust-Oleum designs, manufactures, markets, advertises, warrants, and sells a variety of deck and other surface coatings, including paints, stains, and resurfacers.

28.    As is known in the coatings industry, consumers purchasing wood and other outdoor and exterior surface coating products for their homes want products that will withstand harsh weather conditions but maintain their aesthetic appeal while lasting for a long time. With a large variety of wood and concrete surface coating products available in the marketplace, manufacturers must innovate to distinguish themselves from their competition.

29.    Outdoor wooden decks, docks, concrete patios, and similar structures typically require upkeep as they are exposed to the elements and to surface contact. Traditionally, that upkeep would have required application of a paint or stain on a yearly or other periodic basis, and then eventual replacement of the structure entirely.

30.    In recent years, acrylic coatings came to the market such that homeowners now have the option of applying these "resurfacers"—a thicker, longer lasting coating than paint or stain. Deck resurfacers are used to extend the life of the surface by repairing splinters, filling

8

cracks, and coating a worn deck to make it look revitalized or like new. Because resurfacers offer the promise of extending the life of a surface and avoid the hassle of traditional upkeep and/or the great expense and effort of completely replacing a structure altogether, these products are substantially more expensive than regular paints and stains.

31.     Rust-Oleum's Restore brand was one of the numerous brands of deck surfacing and resurfacing products available on the market.

32.     Rust-Oleum Restore Deck Start Wood Primer is a water-based acrylic coating that, according to Rust-Oleum, is intended for use on weathered, worn or previously coated wood decks, docks and exterior wood furniture.[2] Restore Deck Start Wood Primer is a primer product, intended to be applied to surfaces to prime for application of a top coating.

33.     Rust-Oleum Restore 2X is a water-based polyurethane modified acrylic coating which, according to Rust-Oleum, is designed to resurface decks, docks, patios, and walkways.[3]

34.     Rust-Oleum Restore 4X is a "high build" water-based acrylic coating which, according to Rust-Oleum, is designed to resurface aged wood and concrete decks and other surfaces.[4]

**B.     Rust-Oleum's Marketing of Restore Products**

35.     Rust-Oleum promotes its Restore Products as being innovative and of high quality.

---

[2] RUST-OLEUM, *Restore Deck Start Wood Primer,*
https://www.rustoleum.com/~/media/DigitalEncyclopedia/Documents/RustoleumUSA/TDS/English/CBG/Restore/RST-16_Restore_Deck_Start_Wood_Primer_TDS.ashx (last visited Apr. 12 2022).

[3] RUST-OLEUM, *Restore 2x One Coat Solid Stain,*
https://www.rustoleum.com/~/media/DigitalEncyclopedia/Documents/RustoleumUSA/TDS/English/CBG/Restore/RST-08_Restore_2X_One_Coat_Solid_Stain_TDS.ashx (last visited Apr. 12, 2022).

[4] RUST-OLEUM,*Restore 4x Deck Coat,*
https://www.rustoleum.com/~/media/DigitalEncyclopedia/Documents/RustoleumUSA/TDS/English/CBG/Restore/RST-07_Restore_4X_Deck_Coat_TDS.ashx (last visited April 12, 2022).

On its website, Rust-Oleum claims "to be a global leader in manufacturing innovative coatings" and to produce "high-performance coatings."[5] Its website previously claimed that it offers "some of the most . . . durable . . . products in the industry" and that "[i]f you've got a surface you need to protect . . . you've come to the right place. We have a coating for every challenge."[6]

36.     To distinguish itself in the marketplace, Rust-Oleum touts—on Restore Product labels, product literature and technical data, on the websites where the Restore Products are sold, and elsewhere—the Restore Products' durability weather-resistant, and restorative qualities.

37.     Rust-Oleum marketed the Restore Products as a better alternative to using traditional paints and stains, or to replacing worn and old decks, porches, patios and other structures altogether. Its Products are marketed as capable of restoring weathered decks, porches, patios, and other structures, and promoting a deck facelifting or revitalization over replacement.

38.     Indeed, a key aspect of its marketing efforts is in the name of its brand— "Restore"—which conveys to consumers that the products are actually capable of restoring decks and other outdoor surfaces, so that consumers do not have to incur the great expense of replacing those structures.

39.     Rust-Oleum aggressively marketed the purported durability and quality of the Restore Products. Rust-Oleum made at least all of the following representations regarding Restore Deck Start Wood Primer on its product labeling and technical data sheets for that product:

- "simplifies prep & promotes topcoat adhesion";

- "ideal for: wood decks, fences, siding, furniture & more";

---

[5] RUST-OLEUM, *Rust-Oleum's History,*
https://www.rustoleum.com/pages/about-rust-oleum/our-history (last visited Apr. 6, 2022).

[6] RUST-OLEUM, *Rust-Oleum's History,*
https://web.archive.org/web/20210512090221/www.rustoleum.com/pages/about-rust-oleum/our-history (last visited Apr. 6, 2022).

- "for use on weathered, worn or previously coated wood decks, docks and exterior wood furniture";

- "works with any solid topcoat";

- "works on weathered & worn wood."[7]

40.    A photograph of a pail of Restore Deck Start Wood Primer is below, and contains numerous of these representations:



41.    Rust-Oleum made at least all of the following representations regarding Restore 2X One Coat Solid Stain on its product labeling and technical data sheets for that product:

- "one coat application";

- "algae and mildew resistant";

- "ideal for: wood decks, fences, siding, furniture & more";

- "extends the life of your deck";

- "superior";

[7] RUST-OLEUM, *Restore Deck Start Wood Primer, see supra* n.2.

- "designed to resurface wood decks, docks, concrete patios and walkways";

- "extend[s] the life of deck and patio surfaces";

- "superior" or "excellent water repellency."[8]

42.     A photograph of a pail of Restore 2X One Coat Solid Stain is below, and contains numerous of these representations:



43.     Rust-Oleum made at least all of the following representations regarding Restore 4X Deck Coat on its product labeling and technical data sheets for that product:

- "outlasts typical deck stains";

- "superior coverage";

- "long-lasting protection";

- "barefoot friendly";

- "conceals hairline cracks";

---

[8] RUST-OLEUM, *Restore 2x One Coat Solid Stain, see supra* n.3.

- "restores the beauty of moderately worn decks & patios";

- "enhanced durability";

- "barefoot friendly";

- "ultimate weather resistance";

- "fills hairline cracks";

- "high build";

- "designed to resurface aged wood and concrete decks, patios, and walkways";

- "high build finish provide[s] slip resistance and can bridge over or fill small cracks, checks, nail holes, or other minor surface defects."[9]

44.    Photographs of pails of Restore 4X Deck Coat are below, which contain a number of these representations:



[9] RUST-OLEUM, *Restore 4x Deck Coat, see supra* n.4.



45.     In other advertising, Rust-Oleum further touts the quality of its Restore Products. For example, in a video on Rust-Oleum's YouTube page, it claims its Restore Products are "groundbreaking deck coating products that are engineered to add years to the life of your deck." The video refers to Rust-Oleum 4X as a "superior product" capable of "resurface[ing] almost any wood or composite deck"; capable of "leaving [decks] protected against moisture and damaging effects of the sun."[10]

46.     Rust-Oleum claims Restore 4X was formulated for decks that need to be "refreshed" due to being "weathered." It claims Restore 4X facelifts these decks as it "coats the deck surface and fills the hairline cracks, beautifying and protecting [decks] for years to come."[11]

47.     The various websites where consumers purchase the Restore Products contained the same or similar statements and representations regarding the Restore Products. For example, on The Home Depot's website, the following description for Restore 4X Deck Coat is provided:

---

[10] Rust-Oleum, *Rust-Oleum Restore 4x and Rust-Oleum Restore 10x,* YOUTUBE (June 20, 2014), https://www.youtube.com/watch?v=ZozauvRFuhM (last visited Apr. 6, 2022).

[11] *Id*.

<u>Product Overview</u>

Restore 4X Deck Coat is a water based problem solving coating, formulated to make light repairs and is 4X thicker than ordinary paint. It beautifies and protects old previously coated wood, bare wood, broom swept concrete and most synthetic decking with proper surface preparation. 4X is ideal for wood and composite decking, concrete docks and more.

- Superior coverage

- Long lasting protection

- Conceals hairline cracks

- Outlasts typical deck stains

- Barefoot friendly

- For horizontal and vertical surfaces

- Covers 400 sq. ft., two coats required[12]

48. Rust-Oleum's advertising for the Restore Products on The Home Depot's website and on other websites for the resellers where Restore is sold touts the same purported capabilities and qualities as the Products' labels, Rust-Oleum's website, and the technical data sheets for the Products.

49. Consumers paid a premium for the Restore Products. A one-gallon pail of Restore Deck Start Wood Primer, Restore 2X, or Restore 4X retailed for approximately $30-40.

50. The technical data sheets for the Restore Products indicate that one gallon of Restore Deck Start Wood Primer purports to cover up to 450 square feet with one coating required; one gallon of Restore 2X purports to cover up to 250 square feet and only one coat is required; and

---

[12] THE HOME DEPOT, *5 Gal. Gray Exterior Deck Coat*, https://www.homedepot.com/p/Rust-Oleum-Restore-5-gal-4X-Gray-Deck-Coat-41528/204981352?MERCH=REC-_-PIPHorizontal1_rr-_-204958468-_-%7B%7BproductId%7D%7D-_-N (last visited Apr. 6, 2022).

one gallon of Restore 4X purports to cover up to 80 square feet with two coats necessary.[13]

51.    Each of the Restore Products are substantially similar products that serve the same or similar purpose, with similar and overlapping product labeling and advertising and similar formulas and branding. The Products are all water-based acrylic coatings that purport to be high-quality deck re-surfacing products.

**C.    Defendant Falsely Markets the Characteristics and Quality of the Restore Products While Omitting the Truth About the Products**

52.    As identified above, Rust-Oleum prominently advertises and markets the purported high quality and durability of its Restore Products, including directly on product labeling, on its website, and on the websites of its resellers (e.g., Home Depot, Lowe's).

53.    The Restore Product labels all echo the same themes present in online advertising and in product literature: that the Restore Products are high quality, durable, superior, capable of resisting the elements, will actually cover the specified square footage, and provide long lasting protection and results so that consumers can resurface decks and other surfaces, rather than replacing these structures. Rust-Oleum touts that these qualities can be realized by applying one coat of the Products and confirms on Product labeling that one gallon of Product will achieve a certain square footage of coverage. Defendant specifically advertises that the Products have a "high build finish" and provide "enhanced durability," which consumers understand would allow the Products to resist cracking and peeling, and that the products, when applied properly, fill cracks and other wear and tear on decks and other similar surfaces, revitalizing those surfaces.

---

[13] RUST-OLEUM, *Restore Deck Start Wood Primer*, *see supra* n.2;
RUST-OLEUM, *Restore 2x One Coat Solid Stain, see supra* n.3;
RUST-OLEUM, *Restore 4x Deck Coat, see supra* n.4.

54.     Rust-Oleum advertises that the Restore Products are long-lasting and reliable, leading reasonable consumers to believe that the Restore Products are premier and superior products, and Rust-Oleum has charged and continues to charge consumers premium prices for Restore Products upon these pretenses, among others alleged herein.

55.     When consumers purchase or purchased the Restore Products—whether at Home Depot or Lowe's locations, online, or elsewhere—they are uniformly exposed to and see Rust-Oleum's representations regarding the Restore Products' characteristics, which is visible on all Restore Products labeling (and in other in-store advertising).

56.     As discussed *supra*, when consumers purchase Restore Products online, e.g., through The Home Depot's website, they are also uniformly exposed to the same representations and advertising concerning the Restore Products

57.     The purpose of Defendant's advertising and marketing of Restore Products, and dissemination of advertising materials regarding Restore Products, e.g., long-lasting, durable, superior coverage, capable of restoring decks, capable of repelling water, etc., could only be to persuade consumers that the Restore Products possess these qualities and are functional with the ability to act as a weather barrier and a restorative and protective coating for many years while making decks and other surfaces look like new or "Restore[d]."

58.     Rust-Oleum's guarantees, promises, and other representations about its Restore Products induced Plaintiffs and other customers into purchasing the products and lead consumers to believe that the Restore Products are long-lasting and that Rust-Oleum stands behind its advertising and representations.

59.     However, the Restore Products do not live up to these promises. Rust-Oleum's representations about the quality, durability, longevity, and other characteristics of the Restore

Products are false and materially misleading.

60.    Rust-Oleum is aware and had actual or constructive notice that the Restore Products are of inferior quality and susceptible to failure shortly after application, and that the Restore Products do not, in fact, provide lasting results and enhanced durability, even when applied properly in compliance with the product instructions.

61.    The Restore Products routinely crack, chip, peel, strip, and otherwise fail or degrade, and they do so in weather conditions that the products are advertised as capable of withstanding.

62.    Furthermore, despite Rust-Oleum's representations to the contrary, the Restore Products do not successfully "Restore" decks, are not durable, do not protect and revitalize decks and other surfaces to which the products are applied, and fall short of numerous other representations and marketing statements, as consumers routinely report that the Restore Products chip, bubble, and do not fill cracks, and do not seal their structures, and permit moisture intrusion, allowing moisture and water to accumulate between the coating and the deck boards, which often leads to mildew, degradation and rotting of the underlying structure.

63.    Despite knowledge that the Products are flawed and do not perform as represented, Rust-Oleum continued to market them as high-quality products with highly specific representations about the Products' performance and qualities, while masking and failing to disclose the Products' inferiority.

64.    Rust-Oleum knowingly and intentionally concealed and failed to disclose—notwithstanding statements on its websites, technical data sheets, advertisements, product labels, and elsewhere—that the Products often fail shortly, i.e., within weeks and months, after proper application, which is inconsistent with the advertised "long lasting protection" these products

purport to provide. Indeed, the fact that the Products deteriorate at such a fast rate and will continue to deteriorate quickly demonstrates a lack of durability and resiliency, that the Products are not capable of proper adhesion, and that the Products do not "Restore" decks and other structures.

65. Defendant also made numerous material omissions in relevant advertisements and literature, and uniformly withheld important information relating to the design, reliability, and performance of the Restore Products.

66. Purchasers of the Restore Products made purchasing decisions based upon the information presented by Rust-Oleum, including on its website, in marketing literature, advertisements, commercials, product labels, and warranties.

67. Rust-Oleum made each of the above-described assertions, statements, representations, and warranties with the intent and purpose of inducing consumers to purchase and apply its Restore Products on structures throughout the United States. However, it knew that these representations were not true and that the Restore Products would not function as promised and advertised.

68. Had Rust-Oleum not withheld and omitted material information about the reliability and performance of the Products, Plaintiffs and the members of the Class would not have purchased them or would have paid considerably less for them than they did.

**D.    Rust-Oleum Had Pre-Sale Knowledge of the Adhesion Defect**

69. Rust-Oleum was aware and had actual or constructive notice that the Restore Products contain an adhesion defect and that they do not adhere properly to surfaces despite proper application in compliance with the Products' instructions. Rust-Oleum knew this prior to selling the Restore Products to Plaintiffs and consumers.

70. This pre-sale knowledge is established based upon pre-sale testing of the Restore

Products, coupled with previous litigation regarding Rust-Oleum's other similar products, and consumer complaints that began piling up immediately and shortly after taking the Restore Products to market.

71.     Rust-Oleum engages in rigorous testing of all of its products prior to offering them to consumers on the open market. This includes the Restore Products. It acknowledges as much on its website, confirming "[w]e test the products in our laboratory under accelerated harsh conditions," and that Rust-Oleum "products must pass our rigorous testing . . . ."[14]

72.     Major manufacturers like Rust-Oleum use a variety of early warning systems and statistical analyses to detect problems before they can affect consumers. Defendant, in particular, has an extensive quality monitoring department that conducts product sampling and testing during production and before sale to ensure product performance, effectiveness, and efficiency. Quality improvement teams in this department also collect and actively monitor performance information in a database and provide feedback and interpretation to management and staff. These teams perform internal corporate quality audits that result in quality improvement initiatives. When problems are detected, Defendant may conduct a root cause analysis and take corrective actions. The results of this testing would have revealed to Defendant (before it began to sell the Restore Products) that Restore is not suitable for its marketed use.

73.     Rust-Oleum tested the Products through validation testing and application to the surfaces to which they are intended for application to replicate actual consumer use. It conducted field testing designed to simulate short-term and long-term Product exposure foot traffic and sunlight, temperature, humidity, precipitation, and other environmental factors prior to sale. These

---

[14] RUST-OLEUM, https://www.rustoleum.com/pages/licensing/certified-protection (last visited Apr. 12, 2022).

tests simulate real world, actual consumer use in a host of environmental and climate scenarios. Given the speed at which Restore Products begin to fail for consumers, the results of this testing would have informed Defendant that the Restore Products are susceptible to peeling, stripping, cracking, and other failures alleged herein, and are not suitable for their marketed use.

74. As discussed *infra,* Rust-Oleum has also been routinely notified by customers that the Products do not function as advertised, through internet complaints, complaints to its resellers, complaints directly to Rust-Oleum, and complaints on product review pages

75. Furthermore, this is not the first time Rust-Oleum has been sued regarding the defective nature and inferiority of its Restore deck coating products in the "Restore" line. Similar products marketed and sold by Rust-Oleum under the "Restore" brand were previously the subject of a well-known class action lawsuit that asserted similar allegations regarding product failures in those Restore products. *See In Re: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation*, No. 1:15-cv-1364, MDL No. 2602 (N.D. Ill.).

76. This lawsuit also put Rust-Oleum on notice that its Restore Products are flawed and result in product failure.

77. As discussed herein, Rust-Oleum engaged in rigorous and harsh testing of the Restore Products prior to release. Due to the prevalence of the defect as reported by consumers, and previous issues with similar products, Rust-Oleum had knowledge, or should have known, that the Restore Products are defective and have adhesion issues.

78. The amassed weight of these factors made it more likely than not that Rust-Oleum knew of the defective nature of the Products prior to sale, and that it would have learned of and been alerted to the adhesion issues during pre-sale testing.

## E.  Internet Complaints About Restore Products

79.  Plaintiffs' circumstances are not an isolated incident. Indeed, the internet is replete with consumer complaints about the low quality and premature failure of the Restore Products. The following represents a small sampling of numerous internet postings by disappointed and aggrieved purchasers of Restore Products (all sic and emphasis added):

---

**(**Restore 4X)

★★★★★ 1 out of 5 stars.
Frank981
11 months ago
Worst product ever!
I would like to warn everyone of this product's inferior quality! I wish I had never bought this for my deck! The **parts that have not peeled off on their own now have to be removed before the entire deck rots as the stain holds in the moisture where it still is on the deck and won't let it dry.** Stays wet! Beware. I would NOT never recommend it or ever use this product on anything.[15]

---

**(**Restore 4X)

**it peeled 1st year! had to repaint**
**October 17, 2019**
it **peeled 1st year!** had to repaint[16]

---

(Restore 2X)

Applied this product ~1 year ago following the manufacture's recommended wood preparation instructions and Restore Deck Start

---

[15] Frank981, Comment to *Rust-Oleum Restore 4x Deck Cover, 5-Gallon,* TRUEVALUE, https://www.truevalue.com/restore-4x-deck-cover-5-gal (emphasis added) (last visited Apr. 12, 2022).

[16] DONALD, Comment to *5 gal. 4X Gray Deck Coat*, THE HOME DEPOT (Oct. 17, 2019), https://www.homedepot.com/p/Rust-Oleum-Restore-5-gal-4X-Gray-Deck-Coat-41528/204981352?MERCH=REC-_-PIPHorizontal1_rr-_-204958468-_-%7B%7BproductId%7D%7D-_-N (emphasis added) (last visited Apr. 12, 2022).

Primer. At first the deck looked great **but after a year the entire deck is peeling and needs to be redone.**[17]

---

(Restore 2X)

**Applied as instructions said**. Cleaned deck prior to applying and used primer as suggested. Looked wonderful on my old deck at first **but after one year it is peeling and looks AWFUL**. The primer is intact but **Restore 2X is peeling in numerous places on 36 x14 ft deck. Much too expensive to do again. Very disappointed in this product**[18]

---

(Restore products, generally)

Don't use this product at all. Worst stuff I have ever used. **Did not last one year and it starts to peel off**. I am refinishing my deck this year by using a belt sander for the small area that has not peeled off. **I also have to replace several boards that have rotted through**. Will not use this product or anything they make again.[19]

(Restore products, generally)

We put the Restore product on our deck after letting our Yellowwood construction weather and dry for about a year and a half. It was to serve 2 purposes. The first yo protect our new deck. The second to make it slip proof for my husband who had polio as a child and wears a brace. It was great for purpose number 2. As far as protecting our deck, no, Seven years after installing our deck we

---

[17] FlagHomeowner, Comment to *1gal. 2X Cool Touch Timberline Deck Stain,* THE HOME DEPOT (May 30, 2017), https://www.homedepot.com/p/Rust-Oleum-Restore-1-gal-2X-Cool-Touch-Timberline-Deck-Stain-286831/205614394#ratings-and-reviews (emphasis added) (last visited Apr. 12, 2022).

[18] Deb, Comment to *1 gal. 2X Cool Touch Timberline Deck Stain,* THE HOME DEPOT (Oct. 29, 2017), https://www.homedepot.com/p/Rust-Oleum-Restore-1-gal-2X-Cool-Touch-Timberline-Deck-Stain-286831/205614394#ratings-and-reviews (emphasis added) (last visited Apr. 12, 2022).

[19] Herb, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM (Feb. 14, 2021), https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (emphasis added) (last visited Apr. 12, 2022).

**have already had ti replace numerous boards and more need it. The boards seem to rot from underneath. What a waste![20]**

---

(Restore 4X)

I went to Ace Hardware store and purchased 1 gallon of Restore 10X and one gallon of **Restore 4X deck stain for $60.00.** Date of purchase 8/16/2020. My husband and daughter worked for two days, one day of prepping the deck and the entire next day applying the stain to our deck. I am enclosing pictures of the results which are devastating. **The deck feels rough and sandy and brittle. You can not walk on it with bare feet. We don't know what to do. I can't believe that this product is still on the shelf and we were unaware of the lawsuit.[21]**

---

(Restore 4X)

Was Deck Restore 4X Not happy…and this was recoated a second time! **Peeled off within a year.[22]**

---

(Restore 2X)

We used this I believe the first time was 2016. It peeled easily and came off in strips. We contacted the company by email. They sent new product so we tried again which was a lot of time and aggravation. Again, **the product failed**. We contacted the company and received this:

Hello Kevin,
Thank you for sending me the new picturesof the deck. I have reviewed your case with management and here is whatwe can do to assist:

**Option #1: Replacement**

[20] Jean Carrell, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM (Jan. 2021), https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (emphasis added) (last visited Apr. 12, 2022).

[21] Linda Lamberson, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM, https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (emphasis added) (last visited Apr. 12, 2022).

[22] Les Schumacher, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM, https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (emphasis added) (last visited Apr. 12, 2022).

We would be willing to offer you **enough replacement** products so that you could clean, prime and recoat your entire deck with the Rock Solid 6X Deck Coat. We would ship the products directly to you and tint the product to your color. It would take 10 – 14 business days to receive the product via Fed Ex Ground. If you choose this option then I would let you know exactly what we will send you.

**Option #2: Refund**
As you do not have a receipt, we would only be able to do a **general refund or** the original Restore products that you physically have in your possession which would be one gallon of **Restore 2X**. The total general refund amount would be $24.97. If you choose this option then let me know and I will have a refund check issued within 7 – 10 days and you would receive the check via US Mail.

Once you choose to either receive a refund or replacement for the products we would consider the "Satisfaction Guarantee" complete and there would be no future refunds, replacements or warranty claims.

Please let me know if you have any questions.

Sincerely,
Geoff Augello
Rust-Oleum Corporation
Product Support Representative
Ph: 877-815-3258

**SERIOUSLY! WE NOT HAVE SPENT HOURS TRYING TO REMOVE THIS AND WILL NOT USE AGAIN. WE ARE CURRENTLY IN PROCESS OF THIS AND IT IS A HORRIBLE, TIME CONSUMING MESS. USING VACATION TIME TO DO THIS AS WELL. REPLACING ROTTEN BOARDS. MAY END UP SPENDING MUCH MORE AS I CANNOT SEE HOW WE CAN REMOVE ALL OF THIS. WE HAVE A HUGE DECK, STAIRS, AND POOL DECK. THIS COMPANY SHOULD BE HELD ACCOUNTABLE. MY HUSBAND IS RECOVERING FROM CANCER AND INSTEAD OF RESTING, HE IS DOING THIS. UNBELIEVABLE THAT THIS IS STILL ON THE SHELF.**[23]

---

[23] Mary Hanne, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM, https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (last visited Apr. 12, 2022).

80.     Below are pictures from the internet taken by dissatisfied consumers who applied

Restore Products to their decks or other structures, which have been ruined or left in disrepair by

the product:





[24] Marge Gawronski, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM, https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (last visited Apr. 12, 2022).

[25] Les Schumacher, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM, https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (last visited Apr. 12, 2022).



81. Rust-Oleum's response to consumer complaints about the failed Restore Products is to simply to offer a purchase price refund or offer to replace defective Restore Products with more defective products. These offers are unacceptable to consumers, as Rust-Oleum does not compensate consumers for the time they waste applying the Restore Products and attempting to remove the products when they inevitably fail, and the monetary expenses incurred when the defective Restore Products damage consumers' underlying decks and other structures, including the cost to replace deck boards or even full decks.

---

[26] June Maybaugh-Stickel, Comment to *Class Action Lawsuit against Rust-Oleum (Rock Solid) Deck Restore,* DECKSTAINHELP.COM, https://www.deckstainhelp.com/class-action-lawsuit-against-rust-oleum-deck-restore/ (last visited Apr. 12, 2022).

82.     Rust-Oleum's product literature for its Restore Products identify that "we can guarantee these products only to conform to our standards of quality, and our liability, if any, will be limited to replacement of defective materials."[27] Putting aside that Rust-Oleum does not actually adhere to its purported warranty limitation that its "liability . . . will be limited to replacement of defective materials"—indeed, it offers refunds to some customers—this "exclusive remedy" limitation is unconscionable and fails under U.C.C. § 2-302. This remedy does not make Plaintiffs and other consumers whole for labor and lost time, as well as the damage to their structures which are damaged by the Restore Products.

## F.     Plaintiffs' Experiences with the Restore Products

### *Plaintiff Nancy Cole*

83.     In or about May 2019, Plaintiff Nancy Cole and her late husband purchased a five-gallon bucket of Restore 2X from her local Home Depot store. They applied the Restore 2X to the deck at her home in Schodack Landing, New York.

84.     Prior to purchasing the Restore Products, Plaintiff Cole had heard of Rust-Oleum and was aware of the company's supposed reputation for quality, including with respect to decking coatings. Prior to purchase, Plaintiff Cole saw advertisements online and in magazines and observed the product labeling on the Restore 2X container, touting that the product would protect her deck from damage and rot. Plaintiff Cole was particularly drawn to the Restore Products' purported qualities, including promises about durability, filling cracks, providing long-lasting results, and being barefoot friendly.

85.     Specifically, Plaintiff Cole saw the representations regarding the qualities and characteristics of Restore 2X on the product container she purchased, namely regarding water

---

[27] RUST-OLEUM, *Restore 4X Deck Coat, see supra* n.4.

repellency and protecting against the elements. She specifically observed the picture on the product cannister that demonstrates water beading up on the deck in the picture, and she believed that the product would protect against water-, rain-, and weather-related damage. Plaintiff Cole saw the statements "one coat application"; "superior water repellency"; "ideal for: wood decks" prior to her purchase, which were on the product labeling. She also saw advertisements on television making similar claims about the Restore Products' capabilities. She also saw the product name "Restore" and relied upon it in making her purchase, thinking that the product could actually restore her deck. Plaintiff Cole specifically relied upon these representations in deciding to purchase the Restore Products.

86.     None of these statements are true as to the Restore Products, including the Restore 2X that Plaintiff Cole purchased. The Restore Products do not "Restore" decks; do not adequately coat and adhere to decks with just "one coat" (the Restore Products peel irrespective of how many coats are applied); do not have "superior water repellency" (the Restore Products allowed moisture intrusion which damaged Plaintiff Cole's deck); and are not "ideal for: wood decks" (the Restore Products do not work on wood decks).

87.     At the time she purchased the Restore Products, Plaintiff also believed Rust-Oleum had a good reputation for its deck coating products—she has since learned otherwise—and relied upon this at the time she purchased Restore Products.

88.     Prior to applying the Restore Products, Plaintiff Cole and her husband prepared their deck exactly according to the product's step-by-step instructions, including spending multiple hours cleaning their decking surface. They spent approximately two eight-hour days—16 hours total—working on resurfacing the deck with Restore Products in strict adherence to and compliance with the product instructions, including time spent preparing the surface and then

actually applying the Restore Products.

89.     Plaintiff Cole applied the Restore Products at a time when she knew it would not rain for the next 3-4 days, having confirmed as much in the weather forecast. It did not rain during at least the 48 hours after they coated their deck with the Restore Products.

90.     Within approximately six months of applying the Restore Products, and despite proper application, Plaintiff Cole's deck became unsightly and was in a state of disrepair due to the Restore Products failing.

91.     Photographs of Plaintiff Cole's deck coated with failed and degrading Restore Products are shown below:



92.     Plaintiff Cole's deck remains in a state of disrepair, as the Restore Products still crack, chip, strip, and otherwise fail and degrade.

93. In or about the fall of 2019, after the Restore Products had begun failing, Plaintiff Cole called Rust-Oleum to complain about the product failure. Ms. Cole informed a representative of Rust-Oleum that she and her husband had applied the Restore Products properly and in accordance with the products' instructions, but nevertheless the Restore Products were stripping up and peeling, and otherwise failing. Rust-Oleum's representative expressed sympathy for the product failure, but failed to extend her any refund, product replacement, or payment for damages to her deck and lost time. Rust-Oleum has not provided Plaintiff Cole with any remedy or repair relating to her deck and the failed Restore Products.

94. Despite spending an inordinate amount of time properly preparing the deck, applying the Restore 2X, and attempting to remove the failed Restore Products, Plaintiff Cole's deck is now rotting and decaying, and Plaintiff will have to replace the deck altogether because the defective Restore Products failed to prevent her deck from decaying, making it unsafe to walk on the deck.

### *Plaintiff Rhonda Bacon*

95. In or about July 2016, Plaintiff Rhonda Bacon purchased five one-gallon buckets of Restore 2X from her local Home Depot store in Topeka, Kansas. She applied the Restore 2X to the deck at her home in Topeka, Kansas.

96. Prior to purchasing the Restore Products, Plaintiff Bacon had heard about Rust-Oleum and was aware of the company's supposed reputation for quality in the deck coatings industry. Plaintiff Bacon saw in-store advertising at The Home Depot and observed the product labeling on the Restore 2X container, touting that the product would "Restore" her deck and protect it deck from damage and rot. Plaintiff Bacon was particularly drawn to Restore Products' purported qualities, including promises about durability and repelling water and the elements.

97.     Specifically, Plaintiff Bacon saw representations regarding the qualities and characteristics of Restore 2X on in-store marketing and on the product container, namely regarding water repellency and protecting against the elements. She believed the Restore 2X would be able to actually "Restore" her deck. Prior to purchase, she specifically observed the picture on the product cannister that demonstrated water beading up on a deck, and therefore believed that the product would protect against water and rain-/weather-related damage. Prior to purchase, Plaintiff Bacon saw the statements "one coat application" and "superior water repellency." She also saw observed the product working on a wood deck in the images on the product pail and believed and relied upon the images suggesting that the product would properly adhere to her deck. She saw and understood these marketing representations prior to her purchase. Plaintiff Bacon specifically relied upon these representations in making a decision to purchase the Restore Products.

98.     None of these representations and statements are true as to the Restore Products, including the Restore 2X that Plaintiff Bacon purchased. The Restore Products do not "Restore" decks; do not adequately coat and adhere to decks with just "one coat" (the Restore Products peel irrespective of how many coats are applied); do not have "superior water repellency" (the Restore Products allowed moisture intrusion which damaged Plaintiff Bacon's deck); and are not workable on, let alone "ideal for" wood decks (the Restore Products do not work on and properly adhere to wood decks). At the time she purchased the Restore Products, Plaintiff Bacon also believed Rust-Oleum had a good reputation for its deck coating products—she has since learned otherwise—and relied upon this at the time she purchased Restore Products.

99.     Prior to applying the Restore Products, Plaintiff prepared her deck exactly according to the product's step-by-step instructions, including spending multiple hours cleaning the deck. She spent approximately 30 hours working on resurfacing the deck with Restore 2X in

strict adherence to the product instructions, including time spent preparing the surface and actually applying the Product.

100.     Plaintiff Bacon applied the Restore Products at a time when she knew it would not rain for the next few days, having confirmed as much in the weather forecast. It did not rain during at least the 48 hours after she coated the deck with the Restore Products.

101.     By spring and early summer of 2017, and despite proper product application, the Restore 2X began failing, and Plaintiff Bacon's deck progressively became unsightly and in a state of disrepair due to the Restore Product failing. Because of the defect in the Restore 2X, water was able to get between the coating and the deck board, which has caused Plaintiff Bacon's deck to decay and rot.

102.     Photographs of Plaintiff Bacon's deck coated with failed and degrading Restore Products are shown below:





103.  To date, Plaintiff Bacon's deck remains in a state of disrepair, as the Restore Products still crack, chip, strip, and otherwise fail and degrade.

104.  Despite spending an inordinate amount of time properly preparing the deck, applying the Restore Products, attempting to remove the failed Restore Products, Plaintiff will have to replace the deck altogether because the defective Restore Products failed to prevent her deck from decaying, making it unsafe to walk on the deck.

**Plaintiff Kimberly Postell**

105.  In or about spring and summer 2016, Plaintiff Kimberly Postell purchased approximately five (5) five-gallon buckets of Restore 4X from The Home Depot in Mansfield, Ohio. She applied the Restore 4X to the vertical surfaces of her three decks at her home in Bellville, Ohio.

106. Prior to purchasing the Restore Products, Plaintiff Postell had heard about Rust-Oleum and was aware of the company's supposed reputation for quality in the deck coatings industry. Plaintiff Postell saw in-store marketing materials about how Restore 4X will protect against moisture intrusion. She believed the Restore 4X would be able to actually "Restore" her deck. She also observed the product labeling on the Restore 4X container prior to purchase, which she viewed as touting that the product would coat her deck and provide long-lasting protection, including from rain and weather damage. Plaintiff Postell was particularly drawn to Restore Products' purported qualities, including promises about durability, filling cracks, and providing long-lasting results and protection.

107. Specifically, Plaintiff Postell saw the representations regarding the qualities and characteristics of Restore 4X on the product container she purchased prior to purchase. She specifically observed the Restore 4X product working on a wood deck in the images on the product cannister and believed and relied upon the images suggesting that the product would properly adhere to her deck. Plaintiff Postell saw the statements "outlasts typical deck stains"; that the product provides "superior coverage" and "long-lasting protection"; that the product "conceals hairline cracks"; and that the product would work on "vertical surfaces," all prior to her purchase, which were on the product labeling. Plaintiff Postell specifically relied upon these representations in deciding to purchase the Restore Products.

108. None of these representations and statements are true as to the Restore Products, including those that Plaintiff Postell purchased. The Restore Products do not "Restore" decks; do not adequately coat and adhere to decks to provide "superior coverage" and "long-lasting protection" (the Restore Products peel and do not provide promised coverage or long-lasting protection); do not have "conceal hairline cracks" (the Restore Products allowed moisture to

intrude through cracks, and the products themselves crack and peel); and are not workable on "vertical surfaces", or any decking surface (the Restore Products do not work on and properly adhere to wood decks). At the time she purchased the Restore Products, Plaintiff Postell also believed Rust-Oleum had a good reputation for its deck coating products—she has since learned otherwise—and relied upon this at the time she purchased Restore Products.

109. Prior to applying the Restore 4X, Plaintiff Postell prepared her deck exactly according to the product's step-by-step instructions, including spending multiple hours cleaning her decking surface. She spent approximately 116 hours working on resurfacing the decks with Restore 4X in strict adherence to the product instructions, including time spent preparing the surface and actually applying the Product.

110. Plaintiff Postell applied the Restore Products at times when she knew it would not rain for the next few days, having confirmed as much in the weather forecast. It did not rain during at least the 48 hours after each time she coated the deck with the Restore Products.

111. By approximately April of 2018, despite proper application, Plaintiff Postell's Restore Products began to fail, and over time the deck became progressively unsightly and in a state of disrepair due to the Restore Products failing.

112. Photographs of Plaintiff Postell's deck coated with degrading Restore Products are shown below:







113.    To date, Plaintiff Postell's deck remains in a state of disrepair, as the Restore Products still crack, chip, strip, and otherwise fail and degrade.

114.    In or about the spring of 2018, after the Restore Products began failing, Plaintiff Postell called Rust-Oleum to complain about the product failure. Ms. Postell spoke with a Rust-Oleum representative, who simply sent Plaintiff Postell a replacement 5-gallon bucket of the Restore 4X. Rust-Oleum's representative failed to extend her any refund or payment for damages to her deck and lost time. Rust-Oleum has not provided Plaintiff Postell with any remedy or repair relating to her deck and the failed Restore Products.

115.    Despite spending an inordinate amount of time properly preparing the deck and applying the Restore Products, Plaintiff will have to replace the deck altogether because the defective Restore Products failed to prevent her deck from decaying and rotting.

***Plaintiff Susan Cormier***

116.    In or about May and June of 2016, Plaintiff Susan Cormier purchased multiple one-

gallon pales of Restore Deck Start Wood Primer, one five-gallon bucket of Restore 4X, and two one-gallon buckets of Restore 4X. She purchased the Primer from The Home Depot in Smithfield, Rhode Island. Plaintiff Cormier purchased the five-gallon Restore 4X bucket from The Home Depot located in Attleboro, Massachusetts for $137, which is located within minutes of her job in Pawtucket, Rhode Island. She subsequently purchased two one-gallon buckets of 4X from The Home Depot in Providence, Rhode Island for $63.94. Plaintiff applied the Restore Primer and 4X to the deck at her home in Lincoln, Rhode Island.

117. Prior to purchasing the Restore Products, Plaintiff Cormier heard about Rust-Oleum and was aware of the company's supposed reputation for quality, including in the deck coating industry. Plaintiff Cormier recalls seeing a commercial for the Restore Products, and did significant internet research into the products before buying them. She also observed the product labeling on the Restore Primer and 4X containers in Home Depot at the time of purchase, touting the product would protect and "Restore" her deck. Plaintiff Cormier was particularly drawn to Restore Products' purported qualities, including promises about durability, filling cracks and lasting protection, including against the elements.

118. Specifically, Plaintiff Cormier saw the representations regarding the qualities and characteristics of Restore Primer and Restore 4X on the product containers she purchased, namely product adhesion, that the products work on wood decks, and that the products are durable. She specifically observed the following statements on the Primer product labeling: "promotes topcoat adhesion" and "works on weathered & worn decks". On the Restore 4X labeling, she observed the following statements: "long-lasting protection"; "superior coverage"; and able to "fill hairline cracks". Plaintiff also thought the products would "Restore" her deck, based on the branding. Plaintiff Cormier specifically relied upon all of these representations in deciding to purchase the

Restore Products. None of these statements are true as to the Restore Products. At the time she purchased the Restore Products, Plaintiff Cormier also believed Rust-Oleum had a good reputation for its deck coating products—she has since learned otherwise—and relied upon this at the time she purchased Restore Products.

119.     Prior to applying the Restore Primer and 4X, Plaintiff Cormier prepared her deck exactly according to the product's step-by-step instructions, including spending multiple hours cleaning her decking surface. She spent approximately 45 hours working on resurfacing the deck with Restore Deck Start Wood Primer and Restore 4X in strict adherence to the product instructions, including time spent preparing the surface and actually applying the Product. This process required Plaintiff to take a full week off from work.

120.     Plaintiff Cormier primed her entire deck with the Primer and then coated her deck with Restore. She applied the Restore Products at a time when she knew it would not rain for the next few days, having confirmed as much in the weather forecast. It did not rain during at least the 48 hours after she coated the deck with the Restore Products.

121.     By approximately April 2017, and despite proper application, Plaintiff Cormier's deck became unsightly and in a state of disrepair due to the Restore Products failing. Specifically, the Restore Products began bubbling and peeling from her deck and got progressively worse as the product began to strip up in large pieces.

122.     Photographs of Plaintiff Cormier's deck coated with degrading Restore are shown below:







123.     Approximately a month after the Restore Products began failing, Plaintiff Cormier contacted The Home Depot to complain about the damage Restore Products caused to her deck. The Home Depot informed Plaintiff Cormier that it had removed Restore Products from its shelves and that she would need to contact Rust-Oleum about the product failure. Plaintiff Cormier contacted Rust-Oleum in May 2017 and spoke with "Team Lead Product Support Rep" Corinna Mena regarding the issue, who attempted to troubleshoot the problems with Restore Products with Plaintiff Cormier over the telephone. During this call Rust-Oleum attempted shift the blame to Plaintiff Cormier claiming she improperly applied the Restore, but Plaintiff Cormier was clear that she applied the Restore Products exactly according to the product instructions.

124.     Rust-Oleum ultimately agreed to send Plaintiff Cormier a stripper product to aid in removing the Restore Products from Plaintiff Cormier's deck and offered to send Plaintiff Cormier a limited refund check for some of the Restore Products she purchased. Rust-Oleum did not refund or reimburse Plaintiff Cormier for the damage to her deck and the labor she undertook in applying and attempting to remove the Restore Products.

125.     Plaintiff Cormier's stripped her deck and painted over the remaining Restore Products three times between 2017 and 2021 due to the fact that it continued to peel off every year and became extremely unsightly. As part of the removal process, Plaintiff was forced to rent a commercial size power washer from a rental company called Quality Rental, at her cost, to remove the failed Restore from her deck, but she still has not been able to remove all of the failed Restore. As a result of the failed Restore Products, several deck boards on Plaintiff Cormier's deck are beginning to rot.

126.     To date, Plaintiff Cormier's deck remains in a state of disrepair, as the Restore Products still crack, chip, strip, and otherwise fail and degrade. Some of Plaintiff Cormier's deck

boards continue to rot because of the failed Restore, which allowed moisture to intrude between the Restore coating and the deck boarding, causing mildew and rot.

127.     Rust-Oleum has failed to make Plaintiff Cormier whole relating to her deck and the failed Restore Products.

128.     Despite spending an inordinate amount of time properly preparing the deck, applying the Restore Products and attempting to remove the failed Restore Products, Plaintiff Cormier believed she will eventually have to replace some of the deck boards, and maybe even the entire deck, because the defective Restore Products failed to prevent her deck from decaying,.

129.     Had Plaintiffs known that the Restore Products were not long-lasting, durable, water- and weather-resistant, do not promote adhesion and do not properly adhere to decks, and otherwise do not provide the performance advertised, and that the Restore Products are not a quality product suitable for application to decks due to a latent adhesion defect, they would not have purchased the Restore Products.

130.     As a result of purchasing and applying the Restore Products to their decks, Plaintiffs have suffered harm, including out of pocket expenses, damage to their structures, and unreimbursed labor and cost.

## **TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

131.     Plaintiffs and members of the Class are within the applicable statute of limitations for the claims presented here. Rust-Oleum has non-public information detailing the propensity of the Restore Products to prematurely degrade, including internal pre-release product testing information, but failed to disclose this information to consumers. Plaintiffs and Class members therefore could not reasonably have known that the Restore Products contained a latent defect and prematurely fail. Rather, consumers relied upon Rust-Oleum's misrepresentations and omissions,

including the statements on the product labeling as set forth above. Rust-Oleum intended Plaintiffs and consumers to rely upon its marketing misrepresentations and omissions, which they did.

132. Once Plaintiffs learned they may have incurred legal damages, they promptly acted to preserve all rights, filing this action. Plaintiffs did not know of the alleged Defect and Rust-Oleum's breaches of warranty, omissions and representations, fraud, deceptive and unfair practices, and other violations, until right before they filed this lawsuit and their claims against Rust-Oleum. Rust-Oleum is estopped from asserting any statute of limitation defense that might otherwise be applicable to the claims asserted herein based upon the discovery rule and due to Rust-Oleum's active concealment of the fact that the Restore Products prematurely degrade and fail.

## CLASS ACTION ALLEGATIONS

133. Plaintiffs bring this lawsuit as a class action under Federal Rule of Civil Procedure 23, on behalf of themselves and all others similarly situated.

134. Plaintiffs seek to represent the following Nationwide Class:

**Nationwide Class**
All individuals and entities residing in the United States and its territories that have purchased, not for resale, Rust-Oleum Restore Deck Start Wood Primer, Restore 2X, or Restore 4X products.

135. Plaintiffs also seek to represent the following state classes:

**New York Class**
All individuals and entities residing in the state of New York that have purchased, not for resale, Rust-Oleum Restore Deck Start Wood Primer, Restore 2X, or Restore 4X products.

**Kansas Class**
All individuals and entities residing in the state of Kansas that have purchased, not for resale, Rust-Oleum Restore Deck Start Wood Primer, Restore 2X, or Restore 4X products.

**Ohio Class**
All individuals and entities residing in the state of Ohio that have purchased, not for resale, Rust-Oleum Restore Deck Start Wood Primer, Restore 2X, or Restore 4X products.

**Rhode Island Class**
All individuals and entities residing in the state of Rhode Island that have purchased, not for resale, Rust-Oleum Restore Deck Start Wood Primer, Restore 2X, or Restore 4X products.

**Massachusetts Purchasers Class**
All individuals and entities who purchased, not for resale, in the commonwealth of Massachusetts, Rust-Oleum Restore Deck Start Wood Primer, Restore 2X, or Restore 4X products.

136. The above defined classes are collectively referred to as the "Class" or "Classes." Plaintiffs reserve the right to re-define the Class(es) prior to class certification as discovery in this action progresses.

137. Excluded from the Class are Rust-Oleum, any entity in which Rust-Oleum have a controlling interest or which has a controlling interest in Rust-Oleum, and Rust-Oleum's legal representatives, assigns and successors. Also excluded are the judge(s) to whom this case is assigned and any member of the judge's immediate family.

138. Class members seek relief under both Rule 23(b)(2) and (b)(3). Specifically, Class members who need to replace decking or patio material and/or repair decks and patios and other surfaces or property seek to have the Court declare any limits on full recovery by the class members to be unenforceable and otherwise null and void. This relief is based solely upon Rust-Oleum's past and current systematic practices and policy of limiting remedies of the Class members, and thus declaratory relief is thus appropriate for the Class as whole. Under Rule 23(b)(3), the central issues for each and every Class member are the same: whether the Restore Products have the propensity to prematurely fail, whether Rust-Oleum acted unlawfully and deceitfully, and whether the Class is entitled to common remedies.

139.     **Numerosity:** The number of persons who are members of the Class is so numerous that joinder of all members in one action is impracticable. The exact number of Class members is unknown. Due to the nature of the trade and commerce involved, as well as the number of complaints by consumers about the problems alleged herein, Plaintiffs believe the Class consists of tens of thousands of consumers.

140.     **Commonality and Predominance:** Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Rust-Oleum complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

- whether Rust-Oleum marketed the Restore Products as a superior, long-lasting, and durable products capable of extending the life of the surfaces to which they are applied;

- whether Rust-Oleum's marketing of the Restore Products was false, deceptive, and/or misleading to reasonable consumers;

- whether the Restore Products are unfit for their ordinary purpose of providing lasting protection to deck and patio surfaces and related structures;

- whether the Restore Products are unfit for their particular purpose of providing protection to deck and patio surfaces from harsh weather conditions and lasting longer than ordinary deck paints or stains;

- whether the Restore Products are defective and susceptible to premature failure;

- whether Rust-Oleum knew or should have known of the defective nature of the Restore Products;

- when Rust-Oleum discovered that the Restore Products are susceptible to premature failure;

- whether Rust-Oleum disclosed knowledge that the Restore Products are susceptible to premature failure;

- whether information about the defective and flawed nature of the Restore Products, and their propensity to fail, was material to consumers;

- whether Rust-Oleum's marketing and advertising representations about the qualities of the Restore Products created warranties;

- whether the Restore Products failed to perform as warranted;

- whether Rust-Oleum breached express and implied warranties;

- whether Rust-Oleum was unjustly enriched by the sale of Restore Products;

- whether any limitations and terms in Rust-Oleum's warranties and any terms and conditions are unconscionable and unenforceable;

- whether, and to what extent, Plaintiffs and the Class suffered damages as a result of Rust-Oleum's conduct; and

- whether Defendant should be declared financially responsible for notifying all Class members about the Restore Products' propensity to prematurely fail and for all damages associated with application of the product on Class members' decks, patios, and similar property/structures.

141. All questions as to the representations and publicly disseminated advertisements and statements attributable to Rust-Oleum at issue herein are similarly common. A determination of Rust-Oleum's knowledge regarding the misleading and deceptive nature of the statements made and alleged herein on websites, brochures, advertisements, commercials, product labels, and

warranties will be applicable to all members of the Class. Further, whether Rust-Oleum violated any applicable state laws and pursued the course of conduct complained of herein, acted intentionally or recklessly in engaging in the conduct described herein, and the extent of the appropriate measure of any declaratory relief, damages, and restitutionary relief are common questions to the Class. Common questions of fact and law outweigh any potential individual ones.

142. **Typicality:** Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and all Class members were injured through Rust-Oleum's uniform misconduct and assert identical claims against Rust-Oleum arising from a uniform course of conduct. Plaintiffs, like all members of the Class, have suffered damages associated with the use of defective Restore Products.

143. **Adequacy of Representation:** Plaintiffs' interests are aligned with those of the Class(es) Plaintiffs seek to represent, and Plaintiffs will fully and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation, including complex consumer fraud and product defects litigation. Plaintiffs have no interests that are antagonistic, contrary to, or in conflict with those of the Class. The Class's interests are well-represented by Plaintiffs and undersigned counsel.

144. **Superiority:** A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiffs' and other Class members' claims. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class members individually to effectively redress Rust-Oleum's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation

increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

## COUNT I

**DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201, *et seq.***
**(On Behalf of the Nationwide Class)**

145. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

146. An actual controversy exists between the parties concerning, *inter alia*:

    a.    Whether Restore Products are defective thus causing them to fail;

    b.    Whether Rust-Oleum knew or should have known of the defects;

    c.    Whether Rust-Oleum misrepresented the nature and quality of Restore Products;

    d.    Whether Rust-Oleum marketed Restore Products as a superior, longer-lasting alternative to other deck surfacing and resurfacing products that is capable of revitalizing and extending the life of decks and other structures to which the products are applied;

    e.    Whether Rust-Oleum's marketing of Restore Products was false, deceptive, and misleading to reasonable consumers;

    f.    Whether Rust-Oleum concealed and/or omitted the defective qualities associated with Restore Products;

    g.    Whether the Restore Products are unfit for their ordinary purposes;

    h.    Whether Rust-Oleum knew that the Restore Products were susceptible to

premature failure;

i.     Whether disclosure of the Restore Products' propensity to degrade and fail is material to reasonable consumers;

j.     Whether Rust-Oleum was unjustly enriched by the sale of defective Restore Products;

k.     Whether Rust-Oleum breached express and implied warranties;

l.     Whether any warranty limitations are unconscionable and void;

m.     Whether Rust-Oleum acted fraudulently, deceptively, or in an unfair manner in handling warranty claims;

n.     Whether Plaintiffs and members of the Class sustained damages and the proper measure thereof; and

o.     Whether Rust-Oleum should be declared financially responsible for notifying class members about the Restore Products' propensity to fail and for all damage to structures to which the defective products are applied.

147.     Pursuant to 28 U.S.C. §§ 2201, the Court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

148.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

149.     Accordingly, Plaintiffs seeks a declaration that:

a.     the Restore Products are defective as set forth herein and cause property damage;

b. the defective nature of Restore Products is material;

c. Rust-Oleum knew or should have known that the Restore Products are prone to premature failure and cause damage to consumers' property;

d. the defective nature of the Restore Products requires disclosure, at Rust-Oleum's expense, to all consumers who purchase(d) them;

e. Rust-Oleum's offer of only a refund of purchase price or product replacement as a remedy for defective Restore Products is unconscionable;

f. Rust-Oleum's warranties fail of their essential purpose and any purported limitation on Rust-Oleum's warranties are unconscionable; and

g. Defendant is required to review and re-audit all prior warranty claims, including those that were denied in part or in whole.

150. The declaratory relief requested herein will generate common answers that will settle the parties' controversy. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## COUNT II

### BREACH OF EXPRESS WARRANTY
**(On Behalf of the Nationwide Class and the New York,
Kansas, Ohio, Rhode Island, and Massachusetts Classes)**

151. Plaintiffs re-alleges and incorporate by reference the preceding paragraphs.

152. Defendant made numerous representations regarding the Restore Products on product labeling, in product literature, in stores where the products are sold, and online, as alleged herein, constituting warranties regarding the Restore Products. These include, but are not limited to, the following:

Restore Deck Start Wood Primer

- "simplifies prep & promotes topcoat adhesion";

- "ideal for: wood decks, fences, siding, furniture & more";

- "for use on weathered, worn or previously coated wood decks, docks and exterior wood furniture";

- "works with any solid topcoat"

- "works on weathered & worn wood."

Restore 2X

- "one coat application";

- "algae and mildew resistant";

- "ideal for: wood decks, fences, siding, furniture & more"

- "extends the life of your deck";

- "superior" product;

- "designed to resurface wood decks, docks, concrete patios and walkways";

- "extend[s] the life of deck and patio surfaces";

- "excellent water repellency."

Restore 4X

- "restores the beauty of moderately worn decks & patios";

- "enhanced durability";

- "barefoot friendly";

- "ultimate weather resistance";

- "fills hairline cracks";

- "high build";

- "designed to resurface aged wood and concrete decks, patios, and walkways";

- "high build finish provide[s] slip resistance and can bridge over or fill small cracks, checks, nail holes, or other minor surface defects."

153.    These representations and promises became a part of the basis of the bargain between the parties and created a collective "express warranty" that the Restore Products would conform to Rust-Oleum's affirmations and promises.

154.    As alleged herein, Plaintiffs and the Class were exposed to uniform advertising and specific advertisement misrepresentations by Defendant— including but not limited to the advertisements and representations in store locations where Rust-Oleum sold its Restore Products, on websites where Rust-Oleum's Restore Products are sold, and on the Restore Products containers and labeling—before or at the time they purchased the Restore Products. Plaintiffs and Class members justifiably relied upon Defendant's representations and omissions regarding the advertised quality and characteristics of the Restore Products in deciding to purchase the Restore Products. Plaintiffs and Class members did not know, and had no reason to know, that the Restore Products were defective prior to purchasing them.

155.    Defendant is also obligated under the terms of its warranty to repair and/or replace Restore Products sold to Plaintiffs as well as to repair and/or replace any structural damages caused by the products.

156.    Defendant has breached express warranties by representation, by supplying Restore Products in a condition that does not satisfy warranty obligations, including because the Restore Products do not conform to Defendant's express warranties or the warranties made by representation in marketing, advertising, and product labeling, and by failing to compensate Plaintiffs for damages caused by the products.

157.     Defendant's conduct described in this complaint constitutes a breach of express warranties under U.C.C. § 2-313.

158.     Plaintiffs have complied with all warranty terms, including application instructions. Defendant, after notice of the problems, has failed to comply with the warranty terms.

159.     Any purported limitations in Rust-Oleum's warranty, are procedurally and substantively unconscionable and thus fail under U.C.C. § 2-302. Defendant knew or should have known that the Restore Products were susceptible to premature failure. Defendant had unequal bargaining power and misrepresented the Restore Products' reliability, and any limitations on remedies unreasonably favor Defendant and fail Plaintiffs' reasonable expectations for product performance.

160.     Privity is not required here. To the extent privity is required, Defendant was and is in privity with Plaintiffs and Class members. Plaintiffs have had sufficient direct dealings with Defendant or its authorized dealers of Restore Products, representatives, and other agents to establish privity of contract.

161.     Alternatively, Plaintiffs and Class members are intended third-party beneficiaries of contracts (including Defendant's implied warranties) between Defendant and its dealers, representatives, and agents; Defendant's advertisements were aimed at Plaintiffs and Class members; and Defendant's warranties were written for the benefit of Plaintiffs and Class members as end users of Restore Products. Defendant's authorized dealers, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Restore Products and have no rights under any warranty; these intermediary entities made no changes to the Restore Products, nor made any additions to (and merely adopted) the warranties issued by Defendant. Accordingly, Defendant is estopped from limiting claims for common law and statutory violations based on a

defense of lack of privity.

162.　As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and Class members have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial, including repair and replacement costs and damages to decks, patios, and other structures or property.

163.　Defendant has long had actual or constructive notice of the breaches of these warranties, and Defendant has failed to cure these breaches.

164.　Defendant had pre-suit notice of the conduct underlying Plaintiffs' warranty claims, including through consumer complaints, previous litigation relating to similar Restore Products, a similar lawsuit relating to the same products at issue in this case filed in the United States District Court for the Northern District of Illinois, captioned as *Garrard v. Rust-Oleum Corporation*, 1:20-CV-00612 (N.D. Ill.), and the filing of this lawsuit. Furthermore, on March 8, 2021, Plaintiffs sent Defendant a pre-suit demand letter notifying and requesting remedies for Defendant's breaches of warranties; however, Rust-Oleum has not cured its breaches.

## COUNT III

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Nationwide Class and the New York,**
**Kansas, Ohio, Rhode Island, and Massachusetts Classes)**

165.　Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

166.　Pursuant to U.C.C. § 2-314, a warranty that goods are merchantable is implied in a contract for sale of goods if the seller is a merchant with respect to the specific goods.

167.　To be "merchantable", goods must be fit for the ordinary purposes for which such goods are used.

168.　Defendant is a "merchant" with respect to acrylic residential coatings like the

Restore Products, as Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and/or selling the Restore Products.

169.     Defendant impliedly warranted to Plaintiffs and Class members that the Restore Products are of a certain quality, free from defects, fit for the ordinary purpose of resurfacing decks and similar structures, and suitable for providing protection to decks, patios, and other similar structures form harsh weather conditions, and that the Restore Products are long-lasting and a better alternative to using ordinary deck paints and stains or simply replacing a deck.

170.     However, the Restore Products are unfit for ordinary use and are not of merchantable quality as warranted by Defendant at the time of sale because the Restore Products are defective and have the propensity to crack, peel, flake, chip, strip, and generally prematurely fail and degrade. Before purchase, Plaintiffs could not have readily discovered that the Restore Products were not merchantable for use as deck resurfacing and restoration products, were not of the same quality as those generally acceptable in the trade and did not conform to the quality previously represented.

171.     Defendant has not sufficiently (i.e., specifically and conspicuously) disclaimed the implied warranty of merchantability, including any remedy for recovery of labor and costs of labor associated with application and removal of flawed Restore Products.

172.     Defendant has failed to provide adequate remedies under its implied warranties, which have caused the implied warranties to fail their essential purpose, thereby permitting the remedies sought herein under these implied warranties.

173.     Any purported limitations in the Restore Products limited warranty, including limiting the exclusive remedy to a refund or replacement, are procedurally and substantively unconscionable and thus fail under U.C.C. § 2-302.

174.     Defendant knew or should have known that the Restore Products are susceptible to premature failure; Defendant had unequal bargaining power and misrepresented the reliability, quality, performance, and qualities of the Restore Products; and any limitations on remedies unreasonably favor Defendant and fail Plaintiffs' and consumers' reasonable expectations for product performance.

175.     Defendant had actual or constructive notice of the breaches of these warranties, and Defendant has failed to cure these breaches.

176.     To the extent privity is required, Defendant was and is in privity with Plaintiffs and Class members by law or by fact. Plaintiffs have had sufficient direct dealings with Defendant or its authorized dealers of Restore Products, representatives, and agents to establish privity of contract.

177.     Alternatively, Plaintiffs and Class members are intended third-party beneficiaries of contracts (including Defendant's implied warranties) between Defendant and its dealers, representatives, and agents; Defendant's advertisements were aimed at Plaintiffs and Class members; and Defendant's warranties were written for the benefit of Plaintiffs and Class members as end users of Restore Products. Defendant's authorized dealers, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Restore Products and have no rights under any warranty; these intermediary entities made no changes to the Restore Products, nor made any additions to (and merely adopted) the warranties issued by Defendant. Accordingly, Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

178.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and Class members have suffered damages, injury in fact, and

ascertainable loss in an amount to be determined at trial, including repair and replacement costs and damages to decks, patios, and other structures or property.

### COUNT IV

**FRAUD/FRAUDULENT CONCEALMENT**
**(On Behalf of the New York, Kansas, Ohio,**
**Rhode Island, and Massachusetts Classes)**

179.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

180.    Defendant misrepresented and concealed or suppressed material facts concerning the performance and quality of the Restore Products. Specifically, Rust-Oleum knew (or should have known) that the Restore Products are prone to premature failure despite proper use and application, which it knew through consumer complaints about the Restore Products; pre-release testing of the Restore Products; and through other litigation that notified Rust-Oleum that its Restore Products are prone to failure. Rust-Oleum knew, at the time it sold Restore Products to Plaintiffs and Class members, that its advertising and marketing representations were false.

181.    However, Rust-Oleum failed to disclose this information prior to or at the time they sold the Restore Products to Plaintiffs and consumers, which was material to their purchasing decision. Defendant did so in order to boost sales of the Restore Products and profits in general. It also did so because it intended consumers, like Plaintiffs, to rely upon its positive product marketing and advertising in deciding to purchase Restore Products.

182.    Plaintiffs and Class members had no way of knowing that Defendant's representations were false and gravely misleading, or that Defendant had omitted imperative details about the Restore Products. Plaintiffs and Class members did not, and could not, unravel Defendant's deception on their own.

183.    Defendant had a duty to disclose the true performance of the Restore Products

because knowledge of the products' premature failure and the details related thereto were known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts, namely about the Defect, due to its familiarity with the Restore Products and knowledge of the Defect acquired through rigorous pre-release testing; and Defendant knew the facts were not known to, or reasonably discoverable, by Plaintiffs and the Class. Defendant also had a duty to disclose because they made many general affirmative representations about the about the qualities of the Restore Products, constituting misleading half-truths.

184. On information and belief, Defendant still has not made full and adequate disclosures, and continues to defraud consumers by concealing material information regarding the Restore Products and the performance and quality of the Restore Products.

185. Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Restore Products (or would have paid less for them). The actions of Plaintiffs and the Class were justified, and Plaintiffs were justified in relying upon Defendant's marketing and advertising lies and omissions in deciding to purchase Restore. Defendant was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

186. Plaintiffs and the Class were uniformly exposed to uniform advertising by Defendant— including but not limited to the advertisements and representations in store locations where Rust-Oleum sold its Restore Products, on websites where Rust-Oleum's Restore Products are sold, and on the Restore Products containers and labeling—before or at the time they purchased the Restore Products. Plaintiffs and Class members justifiably relied upon Defendant's representations and omissions regarding the advertised quality and characteristics of Restore in

deciding to purchase the Restore Products. Plaintiffs and Class members did not know, and had no reason to know, that the Restore Products were defective prior to purchasing them.

187.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they did not receive the value of the premium price paid for the Restore Products and the benefit of their bargain, in addition to other monetary losses and property damage sustained.

188.    Accordingly, Defendant is liable to Plaintiffs and the Class for damages in an amount to be proven at trial.

189.    Defendant's acts were malicious, oppressive, and deliberate, with intent to defraud, and in reckless disregard of Plaintiffs' and Class members' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT V**

**NEGLIGENT MISREPRESENTATION**
**(On Behalf of the Nationwide Class and the New York,**
**Kansas, Ohio, Rhode Island, and Massachusetts Classes)**

190.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

191.    Defendant manufactured, marketed, advertised, sold, and represented the Restore Products to Plaintiffs and Class members as a deck resurfacer and restorative product that is of superior quality, and charged a premium for those products accordingly.

192.    Defendant made numerous material misrepresentations regarding the Restore Products, as alleged herein. Those representations are false and misleading because the Restore Products do not possess these qualities and capabilities, and proper product application actually results in decking and other surfaces requiring greater upkeep and having a shorter lifespan by

requiring repairs (or replacement) due to premature failure.

193.    For example, the Restore Products do not achieve or possess any of the following: "work[] on weathered & worn wood"; "simplify[] prep & promote[] topcoat adhesion"; "work[] with any solid topcoat"; require only a "one coat application"; "algae and mildew resistant"; "extends the life of your deck"; a "superior" product; "restore[] the beauty of moderately worn decks & patios"; "enhanced durability"; "ultimate weather resistance"; "barefoot friendly"; "fill[] hairline cracks"; "long-lasting protection"; "superior coverage"; and others alleged herein.

194.    The Restore Products fail to conceal cracks, and proper application results in cracking, peeling, mildew, etc., making surfaces not suitable to walk on barefoot. The products are not durable, do not properly adhere, are not long-lasting, are not superior, and do not allow consumers to "Restore" weathered and worn decks. Rust-Oleum's marketing representations are false and misrepresentations.

195.    At the time of sale, Defendant had actual or constructive notice of the Restore Products' propensity to prematurely fail, including through previous product failures and related litigation, online complaints, in-store complaints, or through complaints made directly to Defendant over the telephone or through its websites. Thus, Defendant either knew its representations about the Restore Products were false or they had no reasonable grounds for believing that their representations were true.

196.    Defendant also failed to disclose, concealed, suppressed and omitted material information concerning the Restore Products, including that the Restore Products are susceptible to cracking, peeling, flaking, chipping, separating, stripping, generally degrading and otherwise prematurely failing, and causing significant damage to the underlying structures to which the Restore Products are applied.

197. Defendant had a duty to disclose this information as set forth herein. Defendant intended that Plaintiffs and Class members rely upon Defendant's material misrepresentations and omissions to purchase the Restore Products, and Plaintiffs reasonably relied upon Defendant's false advertising, marketing, and other misrepresentations and omissions in deciding to purchase Restore Products.

198. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been damaged in an amount to be determined at trial, including repair and replacement costs and/or damages to other property.

## COUNT VI

### UNJUST ENRICHMENT
**(On Behalf of the Nationwide Class and the New York,**
**Kansas, Ohio, Rhode Island, and Massachusetts Classes)**

199. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

200. This claim is pleaded in the alternative to the other claims pleaded herein.

201. As described herein, Defendant marketed, distributed, and sold the Restore Products as a long-lasting, durable deck resurfacing and restoration product without disclosing the truth about the product, namely that the Restore Products prematurely fail despite proper application.

202. As the intended and expected result of its conscious wrongdoing, Defendant has profited and benefited from Plaintiffs' and Class members' purchase of the Restore Products.

203. Plaintiffs and Class members conferred a benefit upon, and thereby enriched, Defendant in exchange for Restore Products that are flawed, defective, and prematurely fail or degrade.

204. Defendant has voluntarily accepted and retained these profits and benefits, with full

knowledge and awareness that, as a result of Defendant's misconduct, Plaintiffs and the Class were not receiving products of the quality, nature, fitness, or value that had been represented by Defendant, and that reasonable consumers expected.

205.     Defendant has been unjustly enriched by its fraudulent and deceptive withholding of benefits to Plaintiffs and the Class, at the expense of these parties.

206.     Equity and good conscience militate against permitting Defendant to retain these profits and benefits.

207.     Defendant's ill-gotten gains should be disgorged, and Plaintiffs and Class members are entitled to restitution of the profits unjustly obtained by Defendant, with interest.

<u>COUNT VII</u>

**VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES ACT**
**N.Y. Gen. Bus. Law § 349 ("GBL")**
**(On Behalf of the New York Class)**

208.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

209.     Plaintiff Cole and New York Class members are "persons" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(h).

210.     Rust-Oleum is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(b).

211.     Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

212.     In the course of Rust-Oleum's business, it failed to disclose and actively concealed that the Restore Products are flawed and prone to premature failure and degradation, while marketing and advertising the products as being of high-quality, durable, long-lasting, and capable of performing as advertised. Defendant did so with the intent that consumers rely on its

misrepresentation and concealment in deciding whether to purchase Restore Products.

213. By intentionally concealing that the Restore Products are flawed, while advertising them as functional, premium products, and fit for their ordinary and intended purpose, Rust-Oleum engaged in deceptive acts or practices in violation of GBL § 349.

214. Rust-Oleum's deceptive acts or practices were materially misleading. Its conduct was likely to and did deceive reasonable consumers, including Plaintiff Cole, about the true performance and qualities of the Restore Products.

215. Plaintiff Cole and the New York Class members reasonably relied on Defendant's misrepresentations and omissions of material facts in the purchase of the Restore Products. Plaintiff Cole and New York Class members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant suppressed. Had Plaintiff and New York Class members known the truth about the Restore Products, they would not have purchased them, or would not have paid as much form them as they did.

216. Defendant's actions set forth above occurred in the conduct of trade or commerce.

217. Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest. Defendant's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

218. Plaintiff and New York Class members suffered ascertainable loss as a direct and proximate result of Defendant's GBL violations. Among other things, Plaintiff and New York Class members overpaid for Restore Products; suffered damages to their decks and other structures; incurred time and labor associated with applying and removing the Restore Products from their decks, and obtaining repairs to their decks and structures due to the damage caused by the Restore Products; and suffered diminution of value of their decks or other structures and the

homes to which they are appended. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

219.    Plaintiff Cole, individually and on behalf of the New York Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Rust-Oleum from continuing its unfair and deceptive practices.

220.    Under the GBL, Plaintiff and New York Class members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendant acted willfully or knowingly, Plaintiff Cole and New York Class members are entitled to recover three times their actual damages. Plaintiff Cole also is entitled to reasonable attorneys' fees.

## COUNT VIII

**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW § 350**
**N.Y. Gen. Bus. Law § 350 ("GBL")**
**(On Behalf of the New York Class)**

221.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

222.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

223.    Rust-Oleum caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, as alleged herein, and which were known, or which by the exercise of reasonable care should have been known to it, to be untrue and misleading to consumers, including Plaintiff Cole and New York Class members.

224. Rust-Oleum has violated GBL § 350 because the representations or omissions regarding the flaws in and premature failure of the Restore Products as described above were material and likely to deceive a reasonable consumer.

225. Plaintiff and New York Class members have suffered injury, including the loss of money or property, as a result of Defendant's false advertising. In purchasing the Restore Products, Plaintiff Cole and Class members relied on the misrepresentations and/or omissions of Rust-Oleum with respect to the quality, functionality, and performance of the Restore Products. Rust-Oleum's representations turned out to be untrue because the Restore Products are prone to premature failure and degradation despite proper use and application. Had Plaintiff and the New York Class members known this, they would not have purchased their Restore Products and/or paid as much for them.

226. Accordingly, Plaintiff and New York Class members overpaid for their Restore Products and did not receive the benefit of the bargain.

227. Plaintiff Cole, individually and on behalf of the New York Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Rust-Oleum from continuing its unfair, unlawful, and deceptive practices. Plaintiff and New York Class members are entitled to recover their actual damages or $50, whichever is greater. Rust-Oleum acted willfully or knowingly, and Plaintiff and New York Class members are entitled to recover three times their actual damages (of up to $10,000 per individual). Plaintiff Cole is also entitled to reasonable attorneys' fees.

## COUNT IX

**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
**Kan. Stat. Ann. §§ 50-623, *et seq.* ("KCPA")**
**(On Behalf of the Kansas Class)**

228. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

229. Plaintiff Bacon and Kansas Class members are "consumers" within the meaning of the KCPA. Kan. Stat. Ann. § 50-624(b).

230. Plaintiff's and Class members' purchases of Restore Products were "consumer transactions" within the meaning of the KCPA. Kan. Stat. Ann. § 50-624(c).

231. The parties are "persons" within the meaning of the KCPA. Kan. Stat. Ann. § 50-624-(i).

232. Under KCPA § 50-626, "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."

233. Under KCPA § 50-627, "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction."

234. In the course of Rust-Oleum's business, it failed to disclose and actively concealed that the Restore Products are flawed and prone to premature failure and degradation, which it knew and was a known defect, while marketing and advertising the products as being of high-quality, durable, long-lasting, and capable of performing as advertised. Defendant did so with the intent that consumers rely on its misrepresentation and concealment in deciding whether to purchase Restore Products.

235. By intentionally concealing that the Restore Products are flawed, while advertising them as functional, premium products, and fit for their ordinary and intended purpose, Rust-Oleum engaged in deceptive and unconscionable acts or practices in violation of the KCPA.

236. Rust-Oleum's deceptive acts and practices were done knowingly or with reason to know, and include:

    a.    misrepresentations or omissions that "[p]roperty . . . [has] . . . characteristics, . . . uses, benefits or quantities that they do not have" (KCPA § 50-626(b)(1)(A));

    b.    misrepresentations or omissions that "property . . . [is] of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation" (KCPA § 50-626(b)(1)(D));

    c.    "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact" (KCPA § 50-626(b)(2)); and

    d.    "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact" (KCPA § 50-626(b)(3)).

237. Rust-Oleum's acts and practices alleged herein also amount to unconscionable conduct, in violation of KCPA § 50-627(a).

238. Rust-Oleum's deceptive and unconscionable acts or practices were materially misleading. Its conduct was likely to and did deceive reasonable consumers, including Plaintiff Bacon, about the true performance and qualities of the Restore Products.

239. Plaintiff Bacon and the Kansas Class members reasonably relied on Defendant's misrepresentations and omissions of material facts in the purchase of the Restore Products. Plaintiff Bacon and Kansas Class members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendant suppressed. Had Plaintiff and Kansas Class members known the truth about the Restore Products, they would not have purchased them, or would not have paid as much form them as they did.

240. Defendant's actions set forth above occurred in the conduct of trade or commerce.

241. Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest. Defendant's conduct includes unfair and misleading, and unconscionable acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

242. Plaintiff and Kansas Class members suffered ascertainable loss as a direct and proximate result of Defendant's KCPA violations. Among other things, they overpaid for Restore Products; suffered damages to their decks and other structures; incurred time and labor associated with applying and removing the Restore Products from their decks, and obtaining repairs to their decks and structures due to the damage caused by the Restore Products; and suffered diminution of value of their decks or other structures and the homes to which they are appended. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

243. Plaintiff Bacon and Kansas Class members seek relief under Kan. Stat. Ann. § 50-634 and § 50-636, including but not limited to a declaratory judgement that Rust-Oleum's conduct violates the KCPA, for damages, and reasonable attorneys' fees.

## COUNT X

### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
### Ohio Rev. Code Ann. §§ 1345.01, *et seq.* ("OCSPA")
### (On Behalf of the Ohio Class)

244. Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

245. The OCPSA is broad, applying to the sale of consumer goods "to an individual for purposes that are primarily personal, family, or household [uses]." Ohio Code Rev. Ann. § 1345.01(A). Accordingly, the conduct at issue in this case clearly falls within the scope of the OCSPA.

246.     The OCSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction," and that "[s]uch an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Code Rev. Ann. § 1345.02(A).

247.     The OCSPA further provides that "a consumer" has a private cause of action for violations of the statute, and expressly allows for class actions. Ohio Code Rev. Ann. § 1345.09.

248.     Defendant's conduct, as alleged herein, has been unfair and deceptive, for purposes of the OCSPA, by representing (or making omissions concerning):

> a.     "That the subject of a consumer transaction has . . . performance characteristics, . . . uses, or benefits that it does not have" (OCSPA § 1345.02(B)(1));
>
> b.     "That the subject of a consumer transaction is of a particular standard, quality, . . . if it is not" (OCSPA § 1345.02(B)(2));
>
> c.     "That the subject of a consumer transaction has been supplied in accordance with a previous representation, . . ." (OCSPA § 1345.02(B)(5)); and
>
> d.     "That a consumer transaction involves . . . a warranty, . . . other rights, remedies, or obligations if the representation is false" (OCSPA § 1345.02(B)(10).

249.     Rust-Oleum's acts and practices alleged herein also amount to unconscionable conduct, in violation of OCSPA § 1345.03(A).

250.     Defendant acted in the face of prior notice that its conduct was deceptive, unfair, or unconscionable. Material omissions and misrepresentations concerning a product constitute a violation of the statute. It is also a deceptive act or practice for purposes of the OCSPA if a supplier

makes representations, claims, or assertions of fact in the absence of a reasonable basis in fact. *See* Ohio Admin. Code § 109:4-3-10(A).

251.    As a direct and proximate result of Defendant's violations of the OCSPA, Plaintiff Postell and the Ohio Class have been injured.

252.    Pursuant to OCSPA § 1345.09, Plaintiff Postell and the Ohio Class request rescission of their transactions. Plaintiff also seeks reasonable attorneys' fees, and any other appropriate relief allowed for under the OCSPA.

**COUNT XI**

**VIOLATIONS OF THE RHODE ISLAND UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT
R.I. Gen. Laws § 6-13.1-1 *et seq.* ("UTPCPA")
(On Behalf of the Rhode Island Class)**

253.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs.

254.    Plaintiff Cormier, Rhode Island Class members, and Defendant are "persons" within the meaning of UTPCPA § 6-13.1-1(3).

255.    The UTPCPA provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." R.I. Gen. Laws § 6-13.1-2.

256.    The UTPCPA makes unlawful the following "unfair or deceptive acts or practices" committed by Rust-Oleum through the conduct alleged herein:

     a.    "Using deceptive representations . . . in connection with goods or services" (UTPCPA § 6-13.1-1(6)(iv));

     b.    "Representing that goods . . . have . . . characteristics, . . . uses, benefits . . . that they do not have . . ." (UTPCPA § 6-13.1-1(6)(v));

     c.    "Representing that goods . . . are of a particular standard, quality, or grade . . . if they are of another" (UTPCPA § 6-13.1-1(6)(vii));

d. "Advertising goods . . . with intent not to sell them as advertised" (UTPCPA § 6-13.1-1(6)(ix));

e. "Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding" (UTPCPA § 6-13.1-1(6)(xii));

f. "Engaging in any act or practice that is unfair or deceptive to the consumer" (UTPCPA § 6-13.1-1(6)(xiii)); and

g. "Using any other methods, acts, or practices that mislead or deceive members of the public in a material respect" (UTPCPA § 6-13.1-1(6)(xiv)).

257. Defendant acted in the face of prior notice that its conduct was deceptive and unfair. Material omissions and misrepresentations concerning a product constitute a violation of the statute.

258. As a direct and proximate result of Defendant's violations of the Rhode Island UTPCPA, Plaintiff Cormier and the Rhode Island Class have been injured.

259. Plaintiff Cormier and the Rhode Island Class have suffered injuries in fact and actual damages, including financial losses and property damage, resulting from the defective Restore Products due to Defendant's violations of the UTPCPA. These injuries are of the type that the UTPCPA was designed to prevent and are the direct and proximate result of Defendant's unlawful conduct.

260. Pursuant to R.I. Gen. Laws § 6-13.1-5.2, Plaintiff Cormier and the Rhode Island Class request actual damages or five hundred dollars ($500), whichever is greater; damages equal to three (3) times the amount of actual damages; equitable and declaratory relief; reasonable attorneys' fees; and any other appropriate relief allowed for under the UTPCPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, pray for relief and judgment to be entered upon Defendant Rust-Oleum Corporation as follows:

A. Enter an order certifying the proposed class or classes, designating Plaintiffs and Plaintiffs' counsel to represent the proposed class;

B. Declare that Defendant is financially responsible for notifying all Class members of the problems with the Restore Products alleged herein;

C. Declare that any limitations on Class members' remedies under any warranties are unconscionable and void;

D. Declare that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from sales of Restore Products, or order Defendant to make full restitution to Plaintiffs and the Class members;

E. Require Defendant to re-audit and reassess all prior warranty claims regarding Restore Products, including claims previously denied in whole or in part, where the denial was based on warranty or other grounds;

F. Award economic and compensatory damages on behalf of Plaintiffs and the Class members;

G. Award actual damages, treble damages, and/or any other form of monetary relief provided by law;

H. Award punitive or exemplary damages, as applicable;

I. Enter an Order enjoining Defendant from its unlawful conduct, for declaratory relief, all other equitable relief as the Court deems proper;

J. Award Plaintiffs and the Class pre-judgment and post-judgment interest as allowed under the law;

K. Award Plaintiffs and the Class reasonable attorney's fees and costs of suit; and

L. Award such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

DATED: April 12, 2022

Respectfully submitted,

*/s/ Andrew W. Ferich*
ANDREW W. FERICH (*pro hac vice*)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

ROBERT R. AHDOOT (*pro hac vice*)
*rahdoot@ahdootwolfson.com*
CHRISTOPHER STINER (*pro hac vice*)
*cstiner@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

KATRINA CARROLL
*katrina@lcllp.com*
KYLE SHAMBERG
*kyle@lcllp.com*
**LYNCH CARPENTER**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
312.750.1265 (*telephone*)

JOHN G. EMERSON
**EMERSON FIRM, PLLC**

2500 Wilcrest, Suite 300
Houston, TX 77042
800.551.8649 (*telephone*)
501.286.4659 (*facsimile*)

*Attorneys for Plaintiffs and the Proposed Classes*